IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| J.H., a Minor Child, SHAWN JOHNSON, an Individual; and ROGER SCOTT HUNTER, an Individual, <br><br> Plaintiffs, <br><br> v. <br><br> JEFFERSON COUNTY, JEFFERSON COUNTY SHERIFF DEPARTMENT; BLAIR OLSEN, Individually and in his Capacity as the Jefferson County Sheriff, and JOHN DOES I - X, <br><br> Defendants. | Case No. CV-05-0518-E-BLW <br><br> **MEMORANDUM DECISION** |

## INTRODUCTION

The Court has before it a motion for summary judgment filed by the defendants.  The Court heard oral argument on January 19, 2007, and the motion is at issue.  For the reasons expressed below, the Court will grant the motion.

## FACTUAL BACKGROUND

### 1.  <u>Plaintiffs' Claims</u>

The plaintiffs bring this action to recover damages for the death of their father, Roger Hunter, who died while serving time in the Jefferson County Jail.

Hunter had been taking certain prescribed medications, administered to him by the jailers.  After his death, an autopsy revealed that he died as a result of having lethal amounts of one of those prescription drug in his system.

Plaintiffs have sued (1) Blair Olsen, the Jefferson County Sheriff, (2) Jefferson County, and (3) the Jefferson County Sheriff's Department.  Plaintiffs allege causes of action for negligence under Idaho law and for violation of 42 U.S.C. § 1983, based on deprivations of their constitutional rights under the Fifth, Eighth, and Fourteenth Amendments.  Plaintiffs assert that defendants' deliberate indifference to Hunter's serious medical needs caused his death.

**2.      County Policies & Practices**

Jefferson County contracted with Badger Medical P.A., a group of physicians and nurses, to provide medical services to inmates.  *See Ortega Deposition* at pp. 21-23.  Badger Medical personnel were available 24 hours a day.  *See Thompson Deposition* at p. 47.

In the case of an inmate medical emergency, the County had a written policy that Jail Command must be notified.  *See Jail Procedures and Policies, Procedure E.*  That same policy also stated that in the case of an emergency, "the Rigby Quick Response Unit (QRU) will be dispatched to the jail for emergency medical needs."  *Id*.  Jailers had the discretion to contact QRU if they were not able to reach Badger

**Memorandum Decision – Page 2**

Medical.  *See Thompson Deposition* at p. 48, 51 (stating that jailer could call QRU

on his or her own initiative and then inform supervisor).

The County had a written policy governing the management and

administration of prescription drugs for inmates.  *See Jail Policies and Procedures:*

*Management of Pharmaceuticals*.  That policy required that "all jail staff are

properly trained in the administration or distribution of medications."  *Id*. at

Procedure (C)(1).  Prescribed drugs "shall be administered in the prescribed dosage

at the prescribed time by the on-duty jailer."  *Id.* at Procedure (C)(2).  Jailers must

"[c]onfirm that medicine delivered for oral ingestion has, in fact, been ingested."

*Id*. at Procedure (C)(4).  Finally, any adverse reactions "are to be reported at once

to Jail Command  . . . ."  *Id*. at Procedure (C)(5).

The training required by these County policies was provided by Badger

Medical personnel who trained jailers how to pass medications to inmates.  *See*

*Thompson Deposition* at p. 12.  In discussing the training provided by Badger

Medical, jailer Thompson described how the inmate would (1) put the pill on his

tongue and show the jailer, (2) take a drink of water, and then (3) open his mouth

and "show us the tongue and underneath the tongue."  *Id*. at p. 13.  Deputy Hanson

testified to the same thing:  "I have them open their mouth and then check their

gums, check under their tongue."  *See Hanson Deposition* at p. 34.

**Memorandum Decision – Page 3**

3.     **Treatment of Roger Hunter**

Hunter arrived at the Jefferson County Jail on January 4, 2005 to begin

serving a criminal sentence.  Jail officials were informed that Hunter suffered from

depression and was taking various prescribed medications including desipramine,

buspirone, and paroxetine.

On January 5, 2005, the day after his arrival, Hunter suffered a seizure.  *See*

*Exhibit C to Hall Affidavit.*  Sergeant Nora Ortega examined him, and called the

paramedics from the QRU to examine him.  *See Ortega Deposition* at pp. 21-23.

They did so, and Sgt. Ortega also called Badger Medical, and informed them of the

situation.  *Id.*

There is no evidence (in the record excerpts supplied by counsel) that Hunter

suffered any health concerns from January 6th through January 18th.  Jailer

Thompson testified that from January 14th through the 17th, Hunter "was fine, just

like he was normal."  *See Thompson Deposition* at p. 45

On January 19, 2005, Hunter told jailer John Clements that he had suffered a

seizure.  *See Clements Deposition* at pp. 21-22.  Clements told Sgt Ortega, who

called nurse Allie Morris of Badger Medical.  Nurse Morris subsequently

examined Hunter.  During the exam, Hunter told Nurse Morris that he could feel

another seizure coming on, and he started shaking.  *Id.* at p. 24.  When he was done

**Memorandum Decision – Page 4**

shaking, Hunter "said to [Nurse Morris] that maybe he could get into BHC or Blackfoot South [Idaho mental facilities]." *Id.* Morris explained to him that his time in those facilities would not count against his sentence. *Id.*

After the exam, Nurse Morris told Sgt Ortega and Clements that "Hunter was playing games." *See Ortega Deposition* at p. 24. Clements recalls Morris concluding that Hunter "was faking to try and get out of jail." *See Clements Deposition* at pp. 25-26. Morris stated that "he would try and continue doing this in hopes of getting out of jail," and "if [Hunter] gave us any problems, to call her, but not to call [the QRU] . . . unless he was unconscious or breeding [sic] profusely." *Id.* at p. 26.

Morris repeated these instructions in writing in a jail log entry dated January 19th: "If you have any problems with Mr. Hunter please call me. You should not have to call QRU unless he is unconscious or profusely bleeding." *See Exhibit C to Hall Affidavit.* Thus, the jailers had received instructions from a medical professional, Nurse Morris, that they should call her rather than the Rigby QRU unless Hunter was unconscious or bleeding profusely.

The next day, January 20, 2005, Clements saw Hunter sweating, and Hunter asked him for a hammer because "there was people in the shower and he needed to get them out." *See Clements Deposition* at p. 28. On that same day, Corporal

Hanson recalls Hunter wrapping a bar of soap up "like a baby," and asking several times "to get the car and run to the store for diapers and baby formula." *See Hanson Deposition* at p. 22. Corporal Hanson also recalls Hunter saying his son would "come in through the shower head, then later that night ran out down the drain." *Id*.

The next day, January 21st, Clements saw Hunter taking his clothes off and yelling at a non-existent person in his cell. *Id*. at p. 29. He was also "yelling and hitting the walls," "using soap and toilet paper trying to plug his sink and toilet," and "using his thumb as a screwdriver unscrewing the showerhead." Id.

That same day, in response to a call from jail officials, Badger Medical sent Brian Mecham, a mental health specialist, to examine Hunter. *Id*. at p. 31; p. 36. Clements witnessed that exam and testified that Hunter was "very polite and coherent the whole time," a marked change from his behavior just an hour or so earlier. *Id*. However, after the mental health specialist left, Hunter again began "yelling . . . hitting the doors, taking off his clothing again, and he seemed to be sweating very hard again." *Id*. at pp. 32-33.

Hunter had now been examined twice in two days by medical professionals from Badger Medical. At no time were jail officials ever warned by these medical professionals that Hunter may be suffering symptoms of a drug overdose or that his

condition was life-threatening in any way.

Sgt. Ortega was concerned about Hunter and so she moved him to a safer cell and instructed the jailers to "keep the medical watch on him and we took his personal belongings." *See Ortega Deposition* at p. 28. Deputy Hanson began his shift at 6 p.m. on January 21st. At that time he noted in his log that Hunter refused dinner and then was talking to an imaginary person. *See Hanson Deposition* at p. 27. He described Hunter's behavior during the remainder of his shift in the log book as follows:

6:40 p.m. - talking to imaginary person.
7:25 p.m. - kicking the door and walls.
7:37 p.m. - laying down.
7:50 p.m. - talking to nobody.
8:41 p.m. - he was naked sitting backwards on the toilet.
8:52 p.m. - clothes change.
9:20 p.m. - ate a cup of ice cream and laid down on bed.
9:46 p.m. - talking to nobody.
10:04 p.m. - talking to nobody.
10:40 p.m. - laying down talking.
11:00 p.m. - given his meds; laying down talking.
11:? p.m. - laying down, singing.
11:36 p.m. - laying down, singing.
11:47 p.m. - laying down, singing.
12:11 a.m. (Jan. 22nd) - laying down, singing.
12:31 a.m. - laying down, singing.
12:42 a.m. - walking and talking.
1:04 a.m. - climbing on the bars.
1:23 a.m. - singing.
1:40 a.m. - singing.
2:00 a.m. - yelling at the bars.
2:17 a.m. - yelling.

**Memorandum Decision – Page 7**

2:24 a.m. - shaking the door naked.

2:36 a.m. - shaking the door naked.

3:11 a.m. - yelling out loud and tried spitting on me [Deputy Hanson].

3:17 a.m. - masturbating and his lips had cracked. One of his lips had cracked and was bleeding.

3:26 a.m. - laying down yelling.

3:47 a.m. - drinking urine out of the toilet.

4:02 a.m. - screaming.

4:21 a.m. - laying down smoking an invisible joint.

4:39 a.m. - laying down talking.

[Sometime between 4:30 a.m. and 5:00 a.m., Deputy Hanson called Bonneville County Jail to speak with Badger Medical personnel because he knew they were generally there at this time. *See Hanson Deposition* at p. 29. He left a message for them to call him. *Id.* at pp. 29-30]

4:50 a.m. - laying down talking.

5:15 a.m. - laying down talking.

5:23 a.m. - crying, screaming.

5:45 a.m. - laying down.

6:04 a.m. - he refused breakfast, lying on his bunk.

*See Hanson Deposition* at pp. 27-28 (wherein Deputy Hanson reads his log entries). Deputy Hanson's shift ended at 6:00 a.m. on January 22nd. *Id.* at p. 31. He told his replacement, Jailer Thompson, about Hunter's condition. *Id.* at p. 32.

At this time, Badger Medical personnel had not yet returned Deputy Hanson's call. They would not do so until about 6:20 a.m., when they called Deputy Hanson on his cell phone as he was pulling into his driveway after leaving the jail. *Id.* at pp. 30-31. Deputy Hanson described Hunter's behavior and "told them I thought [Hunter] needed to be seen as soon as they could get up there." *Id.* at p. 30.

When Jailer Thompson took over at about 6:00 a.m., he found Hunter's

condition to have gone "downhill.  It was bad."  *See Thompson Deposition* at p. 45.

Thompson recalls that Hunter was lying underneath his bunk, shaking, mumbling

incoherently, and not responding to Thompson's questions.  *Id*. at pp. 49-50.

At 6:58 a.m., Thompson called Nurse Morris at Badger Medical, and

requested her help.  *Id*. at p. 60.  She responded that she would come over when

she was finished with a clinic.  *Id*.  About a half-hour later, at 7:28 a.m.,Nurse

Morris called Thompson and told him she would arrive as soon as the clinic was

done.  *Id*.  There is no evidence that Nurse Morris warned Thompson that Hunter's

condition may be life-threatening or that he should seek immediate medical

treatment pending her arrival.

This delay caused Thompson some concern.  *Id*. at p. 48.  He considered

calling the Rigby QRU, but decided not to do so because "of what was stated by

[nurse] Morris on the 19th in the pass-down log."  *Id*.  Thompson is referring here

to Nurse Morris's admonition in the log that the staff should call her if they had

any problems with Hunter, and that "[y]ou should not have to call QRU unless he

is unconscious or profusely bleeding."  *See Exhibit C to Hall Affidavit*.

Later that morning, a trustee told Thompson that Hunter was turning blue.

Thompson immediately called the QRU and administered CPR to Hunter until the

QRU arrived.  *Id*.

**Memorandum Decision – Page 9**

After being transported to the emergency room at the local hospital, Hunter died that morning, January 22, 2005.  An autopsy was performed the next day, January 23, 2005, by pathologist Dr. Steve Skoumal.  Dr. Skoumal concluded that the cause of death was a desipramine overdose.  *See Exhibit F to Affidavit of Whyte.*  In a letter accompanying the autopsy report, Dr. Skoumal explains that "[d]esipramine's level in the case was at a lethal level and therefore is my cause of death for purposes of my autopsy report."  *Id.*

The defendants have submitted the affidavit of Dr. Matthew Young, who has a doctorate in pharmacy and is an expert in clinical pharmacy.  He reviewed the medical records and the autopsy report.  In his affidavit, he notes that the three drugs Hunter was taking – desipramine, buspirone, and paroxetine – all cause increased serotonin levels in the blood.  *See Young Affidavit* at ¶ 5, p. 2.  "In addition," Dr. Young testifies, "paroxetine inhibits the enzyme that metabolizes desipramine and makes a bad situation worse because it results in even higher levels of serotonin in the body."  *Id.* at ¶ 5, p. 2.  Dr. Young concludes that given Hunter's symptoms and the "desipramine and paroxetine levels that were reported in the pathology report . . ., Hunter most likely suffered from a condition known as serotonin syndrome that ultimately led to his death."  *Id.* at ¶ 6. pp. 2-3.

## ANALYSIS

The defendants have moved for summary judgment on various grounds that the Court will consider separately below.

## 1.   **Bond Requirement**

The defendants assert that plaintiffs' state law claims must be dismissed for their failure to comply with the bonding requirements of Idaho Code § 6-610.[1] Plaintiffs respond that the statute does not apply here, citing the Idaho Tort Claims Act and *Kent v. Pence*, 773 P.2d 290 (Id.Ct.App. 1989).

Past precedent answers this issue.  In past cases the Court has held that (1) Idaho Code § 6-610 is not pre-empted by the Idaho Tort Claims Act, and (2) *Kent* did not deal with § 6-610.  *See Linderman v. Town of St. Anthony*, Civ-96-279-E-BLW (Memorandum Decision filed January 24, 1997).  More recently, the Court again found the bond requirement applicable.  *See Blackhawk v. City of Chubbuck*, Civ-04-629-E-BLW (Memorandum Decision filed November 24, 2006).

Plaintiffs assert, however, that they are indigent.  In *Blackhawk*, the Court found that a properly-filed affidavit under Idaho Code § 31-3220 could establish indigency that would result in the Court waiving the bonding requirement.  Had the

---

[1]  Counsel agree the bonding requirement does not apply to the § 1983 claims.  Moreover, it does not apply to the state law claims against Jefferson County, which is not an entity within the definition of "law enforcement officer" under Idaho Code § 6-610(1).

**Memorandum Decision – Page 11**

Court denied defendants' summary judgment, the Court would have given plaintiffs ten days to submit the proper affidavits under Idaho Code § 31-3220.

## 2.    Immunity of Idaho Code § 6-904B

The defendants allege that they are immune from liability under Idaho Code § 6-904B. That provision states that a governmental entity and its employees "while acting without . . . gross negligence or reckless, willful and wanton conduct . . . shall not be liable for any claim which . . . [a]rises out of any act or omission providing or failing to provide medical care to a prisoner . . . in the custody of any . . . county . . . jail . . . ."  The term "gross negligence" is defined as

> the doing or failing to do an act which a reasonable person in a similar situation and of similar responsibility would, with a minimum of contemplation, be inescapably drawn to recognize his or her duty to do or not do such act and that failing that duty shows deliberate indifference to the harmful consequences to others.

The phrase "reckless, willful and wanton conduct" is defined as being "present only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result."

Here, both sides agree that the Idaho standard is identical to the standard that governs § 1983 actions – the deliberate indifference standard.  Thus, the defendants are immune from liability for the state law claims unless they were  deliberately

**Memorandum Decision – Page 12**

indifferent to the serious medical needs of Hunter.

Plaintiffs argue that jailers displayed deliberate indifference by failing to properly monitor Hunter. More specifically, plaintiffs assert that jailers (1) failed to prevent Hunter from "cheeking" (or hoarding) his drugs; and (2) failed to seek medical assistance at a critical time as Hunter's condition deteriorated. Plaintiffs further assert in their briefing (but not their complaint) that the defendants failed to train the jailers sufficiently in these matters and failed to properly supervise them.

With regard to the claim that training and supervision was improper, the plaintiffs never raised that claim in their complaint. The time for amending the complaint has long since passed and discovery was closed three months ago. *See Docket Entry Order filed March 31, 2006.* Thus, the claim is barred.[2]

The court turns next to the claims that the jailers were deliberately indifferent to Hunter's serious medical needs, thereby establishing that their employer, the County, was grossly negligent and hence not immune under Idaho Code § 6-904B.

**3.    "Cheeking"**

---

[2]  Even if the failure-to-train-and-supervise claim may now be raised, its defects warrant summary judgment as the Court explains below in discussing the § 1983 claim.

**Memorandum Decision – Page 13**

Plaintiffs argue that since Hunter died of a desipramine overdose, he must have been getting extra pills from somewhere.  Plaintiffs assert that Hunter may have been "cheeking" pills – that is, when the jailers gave him his dose of pills, he may have hid some in his cheeks, faked swallowing them to deceive the jailers, and then saved the pills, which he later consumed in a larger-than-prescribed lethal dose.

Plaintiffs argue if cheeking occurred, it was due to the jailers' failure to more closely examine the cheeks of the inmates.  Plaintiffs point out that there is no policy to check inmate's cheeks, only a policy that generally urges jailers to make sure the drugs are ingested.  Plaintiffs also point to Jailer Thompson's testimony that he is not required to physically examine the cheeks of an inmate. *See Thompson Deposition* at pp. 54-55.  Plaintiffs assert that the jailers' failure to prevent Hunter from cheeking his desipramine constituted deliberate indifference to Hunter's serious medical needs and led to his death.

The County had a written policy in place requiring jailers to "confirm that medicine delivered for oral ingestion has, in fact, been ingested." *See Policies and Procedures, supra* at Procedure C.  As recounted above, the jailers were trained by Badger Medical to have the inmates place the pills on their tongue, show this to the jailers, swallow the pills, and then open their mouth so that the jailer could visually

**Memorandum Decision – Page 14**

check the mouth and under the tongue to ensure ingestion.

There is no evidence that the jailers failed to follow this visual inspection procedure when dispensing drugs to Hunter. There is nothing on the face of this procedure that indicates deliberate indifference – it appears the jailers are diligently attempting to determine if the drugs were ingested, as the written jail policy requires.

While plaintiffs argue that this procedure was insufficient, they fail to propose any specific alternative procedure. Should the jailers have swept their finger through the inmate's mouth? Would that be safe for the jailer? Would the jailer be able to feel small pills if he swept with a gloved finger? Would some other procedure be more effective?

Plaintiffs provide no answers to these questions. By failing to propose some alternative procedure, plaintiffs have effectively blocked any inquiry into whether the jailers' failure to use an alternative procedure constitutes deliberate indifference.

The bottom line is that the jailers followed the written policy of the County and the training of Badger Medical. Their procedure of visually examining the mouth and underneath the tongue could not be found by any reasonable juror to constitute deliberate indifference, especially in the complete absence of any

**Memorandum Decision – Page 15**

evidence of a more effective procedure that should have been followed.

**4.**    <u>**Seeking Medical Assistance**</u>

Plaintiffs also assert that jailers failed to seek medical assistance for Hunter. There is no evidence that before January 22nd, Hunter was ever denied medical assistance. In the three days before Hunter's death (January 19-21), there were two occasions where he needed medical assistance, and both times jailers immediately called for and receive that assistance. The first time was on January 19th when Hunter was having a seizure and he was examined by Nurse Morris. The second time was on January 21st, when Hunter was acting strangely and he was examined by mental health specialist Meacham.

By not identifying any denial of assistance prior to January 22nd, the plaintiffs focus their challenge on that day. And by not identifying any problems before 6:00 p.m. on that day, plaintiffs zero in on the shift of Deputy Hanson that started at that time.

As discussed above, Deputy Hanson's log of his shift contains a detailed account of Hunter's behavior. From 6:00 p.m. on January 21st to 2:00 a.m. on January 22nd, Hunter's behavior, while odd, is not alarmingly so. During these eight hours, he is described as talking to imaginary persons, eating ice cream, lying down, climbing on the bars, and singing, none of which cry out for medical

**Memorandum Decision – Page 16**

intervention.  Indeed, he was acting much stranger the day before and yet quickly pulled himself together (becoming "polite" and "coherent") for mental health specialist Meacham.  No reasonable juror could find that Deputy Hanson was deliberately indifferent to Hunter's serious medical needs by failing to seek medical assistance between 6:00 p.m. on January 21st and 2:00 a.m. on January 22nd.

Hunter's behavior grew worse about 2:00 a.m. on January 22nd.  For the next two hours he was shaking the door naked, yelling, screaming, and spitting on Deputy Hanson.  By 3:47 a.m. he was drinking urine out of the toilet.

The earliest that Deputy Hanson should have recognized Hunter needed help was 4:00 a.m. on January 22nd.  Assuming he failed to call until 5:00 a.m., his delay of an hour cannot be deemed deliberate indifference for two main reasons.

First, the medical professionals that had examined Hunter on January 19th and 21st never warned jail officials that Hunter may be suffering from a drug overdose or from any life-threatening condition.  Thus, the jailers were never put on notice that Hunter's life may hang in the balance.  Second, Nurse Morris told the jailers to call her, not the QRU unless Hunter was bleeding profusely or unconscious.  He was neither.  Thus, the jailers cannot be guilty of deliberate indifference when they were following the instructions of a medical professional.

**Memorandum Decision – Page 17**

Even if Deputy Hanson should have called earlier, plaintiffs have submitted no evidence that his delay made any difference. There is no evidence – expert or otherwise, that if Badger Medical or the Rigby QRU arrived at 2:00 a.m., the result would have been any different.

It is plaintiffs' burden to raise questions of fact regarding causation – that is, to raise questions of fact that Deputy Hanson's failure to call for help at, say, 2:00 a.m. caused Hunter's death. *Martinez v. Dyche*, 782 P.2d 56, 58 (Id.Ct.Apps. 1989). Causation is a jury question if "reasonable minds could disagree." *Id.*

Plaintiffs' assert that no expert testimony is needed to create issues of fact. They assert it is obvious that earlier medical intervention would have saved Hunter.

The Court disagrees. Hunter was suffering from a desipramine overdose. What medical procedure, employed at 2:00 a.m. on January 22nd, would have saved Hunter's life? A stomach pump? An antidote? Counteracting medications? The Court has no idea. Plaintiffs have not presented anything on this issue.

Under Idaho law, expert testimony is necessary when the subject is outside the "usual and ordinary experience of the average person." *Dodge-Farrar v. American Cleaning Services, Co., Inc.,* 54 P.3d 954, 958 (2002). Whatever medical procedure could save a person from a desipramine overdose is certainly

"outside the usual and ordinary experience of the average person."

Contrast the lack of expert testimony here with its presence in *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175 (9th Cir. 2002).  In that case, the plaintiffs asserted that a manic depressive inmate would not have died in jail if he had received psychiatric intervention treatment.  In discussing how the jail's deliberate indifference caused the inmate' death, the Circuit found persuasive expert testimony from a psychiatrist explaining how intervention by medical staff would have saved the inmate's life.  *Id*. at 1189-90.  That sort of expert testimony is lacking here.  Even if expert testimony is not required, there is a complete lack of lay testimony on this issue as well.

For all these reasons, no reasonable juror could find that the jailers were deliberately indifferent to Hunter's serious medical needs.  Thus, the immunity set forth in Idaho Code § 6-904B applies, and the defendants are entitled to summary judgment.

**5.      § 1983**

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States

**Memorandum Decision – Page 19**

was violated, and (2) that the alleged violation was committed by a person acting under the color of State law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993).  "Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

This Eighth Amendment deliberate indifference standard looks to the subjective mental state of the person charged with violating an inmate's right to medical treatment.  *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1188 n. 8 (9th Cir. 2002).  A person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety."  *Id.* at 1187.  Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights. *Toguchi v. Chung*, 391 F.3d 1051 (9th Cir. 2004).  Deliberate indifference may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm.  *Id*. at 1057, n. 4.

The County cannot be held liable on a *respondeat superior* theory simply because jailers violated Hunter's rights.  *Monell v. New York City Dept. Of Social*

*Serv.,* 436 U.S. 658, 691 (1978).  Plaintiffs must show that there is a "direct causal link" between a County policy or custom and the constitutional violations of County employees.  *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).  To establish this link, the identified deficiency in the policy must be "closely related to the ultimate injury." *Id*. at 1190.  The plaintiffs' burden is to establish "that the injury would have been avoided had proper policies been implemented." *Id.*

The Court has already found that the jailers were not deliberately indifferent to Hunter's serious medical needs.  Once again, there is no evidence that the medical professionals who examined Hunter on January 19th and 21st ever warned the jail officials that Hunter was suffering from a drug overdose or had any life-threatening condition.  Indeed, Nurse Morris told jailers that Hunter was "faking it" and that they should not call the QRU unless he was bleeding profusely or unconscious.  Given this evidence, no reasonable juror could find that jailers knew of, and disregarded, an excessive risk to Hunter's health.

Plaintiffs assert that a lack of training can be the basis for § 1983 liability when it amounts to deliberate indifference.  *See Long*, 442 F.3d at 1186.  Plaintiffs may prove a failure-to-train claim either by showing a pattern of continuing constitutional violations or by showing that such violations "may be a highly

predictable consequence of a failure to equip . . . [officials] with specific tools to handle recurring situations."  *Id*.

Plaintiffs attempt to prove the latter prong of this test.  They argue that the County and Sheriff Olsen failed to train jailers to recognize the signs of drug overdose and to take appropriate action.  Hunter's death, plaintiffs' assert, was a highly predictable consequence of this failure to train.

Here, the jailers were trained to call Badger Medical or Rigby QRU if medical assistance was needed.  Plaintiffs do not identify with any specificity  what further training the jailers should have received.  The plaintiffs' burden is to establish "that the injury would have been avoided had proper policies been implemented."  *Long,* 442 F.3d at 1190.  Plaintiffs fail to raise any issues of fact on this point because they fail to identify what "proper policies" should have been implemented.

In *Long*, the plaintiffs used expert testimony to identify policies that should have been implemented.  *Id*.  Here, there is a complete lack of such testimony.

In addition, there is no allegation in the complaint that the § 1983 claim is based on a lack of training.  As explained above, the deadline for amending the complaint has expired as has the deadline for discovery.  At oral argument, defense counsel represented that plaintiffs made no failure-to-train claim in any response to

discovery, and that assertion by counsel was not rebutted by plaintiffs' counsel. The first time the plaintiffs raised the failure-to-train claim was in their response brief to defendants' motion for summary judgment.

For all of these reasons – procedural and substantive – the failure-to-train claim must be dismissed.

**6.** **Conclusion**

For all these reasons, the Court will grant defendants' motion for summary judgment. The Court will issue a separate Judgment as required by Rule 58.

DATED: **January 25, 2007**



_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision – Page 23**